**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| JASON CARTER,<br><br>     Plaintiff,<br><br>  v.<br><br>MARK LUDWICK, Agent of Iowa Department of Criminal Investigation, in his individual capacity;<br><br>MARION COUNTY, IOWA;<br><br>REED KIOUS, Marion County Deputy Sheriff in his individual capacity;<br><br>BILLY GENE CARTER,<br><br>     Defendants. | CIVIL ACTION  No.: 4:19-cv-00401<br><br>JURY TRIAL DEMANDED |

**<u>COMPLAINT</u>**

Jason Carter, for his causes of action against the Defendants, state:

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction over the subject matter of this Complaint under the Fourth and Fourteenth Amendments to the United States Constitution and 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights) and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1402(b) because the acts at issue in this lawsuit occurred within the District.

**PARTIES**

3.    Jason Carter, at all relevant times, was a resident of Marion County, Iowa.

4.      Mark Ludwick ("Ludwick") was at all relevant times, an employee of the Iowa Division of Criminal Investigation ("DCI"), and designated as a lead case agent to the case in question.  In his capacity as an Investigator with DCI, Defendant Ludwick had a legal obligation to act in conformity with the United States and Iowa Constitutions and other applicable federal and state laws.  Defendant Ludwick is sued in his individual capacity and at all times relevant to this Complaint was acting within the scope and course of his employment with the State of Iowa. At all times relevant to this Complaint he was acting under color of the laws of the United States and the State of Iowa.

5.      Marion County is a municipal corporation and governmental entity organized and authorized to operate under the laws of Iowa and is located at 214 E. Main Street, Knoxville, Iowa. Marion County is responsible for operation of the Marion County Sheriff's Office ("MCSO") and the Marion County Attorney's Office ("MCAO").

6.      Reed Kious ("Kious") was, at all relevant times, a Deputy Sheriff with the Marion County Sheriff's Office.  In his capacity as a Deputy Sheriff, Defendant Ludwick had a legal obligation to act in conformity with the United States and Iowa Constitutions and other applicable federal and state laws.  Defendant Kious is sued in his individual capacity and at all times relevant to this Complaint was acting within the scope and course of his employment with the State of Iowa. At all times relevant to this Complaint he was acting under color of the laws of the United States and the State of Iowa.

7.      Billy Gene Carter is a resident of Marion County, Iowa.

**GENERAL FACTUAL ALLEGATIONS**

8.      On June 19, 2015, Shirley Carter was murdered at her home in rural Marion County, Iowa. ("the murder[1]")

9.      The MCSO, Detective Reed Kious, and Special Agent Mark Ludwick, as an employee of MCSO as defined by Iowa Code § 670.2(2), participated in investigation of the murder.

10.     The DCI, including Special Agent Mark Ludwick, participated in investigation of the murder.

11.     Ludwick was assigned as the lead case investigator for DCI and was primarily responsible for investigation of the murder.

12.     Ludwick focused investigation on Jason Carter, even before arrival on the scene on the date of the murder.

13.     From the beginning, Ludwick disregarded plainly exculpatory evidence relating to Jason Carter in investigation of the murder.

14.     Ludwick directed other law enforcement officers, including the MCSO, to disregard exculpatory evidence in investigation of the murder.

15.     Ludwick created numerous written reports based on interviews in the investigation of the murder. Many of written reports intentionally misrepresent information obtained in the actual recorded interviews taken by Ludwick and were misrepresentations that left out exculpatory information relating to Jason Carter.

---

[1] For clarity in reading, the term "the murder" is used even when addressing allegations in the related civil action.

16.     MCSO created numerous written reports based on interviews in the investigation of the murder. Many of written reports intentionally misrepresented information obtained in the actual recorded interviews taken by MCSO and were misrepresentations left out exculpatory information relating to Jason Carter.

17.     MCSO's office failed to provide Defendant Deputy Sheriff Reed Kious, their lead investigator, with adequate training and a supervision to be an investigator, let alone a homicide detective even though it was assigning him to be the investigator from the MCSO on Shirley's Carter homicide.

18.     Kious freely admitted that his "perception of what a detective was kind of what I've seen other people do or on TV."

19.     In the criminal investigation of the murder, the civil action against Jason Carter, and the criminal action against Jason Carter, Ludwick made false and defamatory statements regarding Jason Carter.

20.     Ludwick made false and defamatory statements to media, to individuals in the Knoxville and Marion County community, and to Jason Carter's friends and family.

21.     Throughout the criminal investigation of the murder, as well as the civil action against Jason Carter and criminal action against Jason Carter, Bill Carter made numerous false and defamatory statements regarding Jason Carter. These statements were made to media, to individuals and businesses in the Knoxville and Marion County community, and to Jason Carter's friends and family.

22.     On several occasions, Bill Carter contacted individuals and businesses with whom Jason did business. Bill Carter directed individuals and businesses to cease doing

business with Jason Carter, stating falsely that Jason Carter was responsible for the murder of Shirley Carter, as well as other false statements.

## A. FACTS LEADING UP TO THE ARREST OF JASON CARTER

23.     Between June 19, 2015 and December 17, 2017, as well as at other times, Ludwick made numerous statements implicating Jason Carter in the murder to Bill Carter to Jason Carter's siblings, and to Jason Carter's other family. Ludwick made similar statements to other individuals within the Knoxville and Marion County community.

24.     These statements included false representations by Ludwick that he knew to be not true at the time he made them, should reasonably have known to be not true at the time he made, or which were later shown to be untrue and were intentionally not corrected by Ludwick.

25.     Bill Carter, Jason Carter's siblings, and individuals within the Knoxville and Marion County community believed the false statements made by Ludwick.

26.     Ludwick intended these untrue statements to separate Jason Carter from his family and from his community in order to place pressure and emotional distress on Jason Carter, in order to make him confess, and in order to garner support for the prosecution of Jason Carter from Jason Carter's father, family, and community.

27.     Jason Carter, his wife Shelly Carter, Bill Carter, and Jason Carter's siblings each enjoyed a close and supportive family relationship prior to the untrue statements made by Ludwick.

28.     Jason Carter enjoyed a close and supportive relationship within the Knoxville and Marion County Community prior to these untrue statements made by Ludwick.

29.     The untrue statements by Ludwick were the cause of a rift and separation which developed between Jason Carter and Jason Carter's immediate family,[2] and Bill Carter and Jason Carter's siblings.

30.     The untrue statements by Ludwick were the cause of a rift and separation which developed between Jason Carter and his community, and between Jason Carter's immediate family and their community.

31.     The family separation, and separation from friends and the community caused severe emotional distress to Jason Carter, which continues to this day.

32.     The intentionally untrue statements by Ludwick caused Bill Carter to bring a civil lawsuit against Jason Carter, and caused of Bill Carter to work in conjunction with the State against Jason Carter.

33.     On January 5, 2016, Bill Carter filed a civil wrongful death lawsuit naming Jason Carter as defendant in the District Court for Marion County, Iowa.

34.     Bill Carter filed a civil lawsuit against Jason Carter in order to propel a criminal case against Jason Carter for the murder of Shirley Carter.

35.     On July 5, 2016, Plaintiffs in the civil lawsuit - Bill G. Carter, Billy D. Carter, and the Estate of Shirley Carter, by and through Bill G. Carter, executor ("Civil Plaintiffs")

---

[2] Jason Carter's immediate family includes Jason Carter's wife Shelly Carter, and Jason Carter's two children.

served a subpoena on DCI demanding evidence and documentation developed throughout the ongoing murder investigation.

36.    DCI moved to quash, arguing the materials requested were part of an active murder investigation and stating "[r]equiring the release of a law enforcement investigative file relating to civil litigants, including persons who may well be the subject of the investigation, not only defies common sense but finds no support in the law." Jason Carter agreed with this argument and the law supporting it, primarily because there was no question DCI would not provide the entire criminal file to Jason Carter, including any exculpatory evidence, because he was a known suspect.

37.    On August 24, 2016, the Civil Plaintiffs filed a Notice of Resolution, stating the Civil Plaintiffs and DCI reached agreement regarding production of the subpoenaed items. The hearing on DCI's Motion to Quash was cancelled, and Jason Carter considered the matter closed.

38.    Jason Carter's legal team never received documents from the Civil Plaintiffs that were the result of the above "agreement". Plaintiffs failed to disclose the documents received from DCI, in violation of Iowa discovery rules and civil process.

39.    On March 29, 2017, six days before trial was originally scheduled to begin, the Civil Plaintiffs obtained new counsel – the Weinhardt Law Firm.

40.    On April 19, 2017, the Civil Plaintiffs served DCI with a subpoena seeking the same documents as the subpoena DCI received from the Civil Plaintiffs in July 2016.

41.    On May 1, 2017, Jason Carter filed a Motion to Quash the April 2017 subpoena to DCI.

42.     The Civil Plaintiffs served five DCI staff members and one member of the Department of Public Safety with additional subpoenas on June 12, 2017, commanding them to appear at trial and to bring with them substantial amounts of material and investigative documents developed in the ongoing murder investigation. Jason Carter also moved to quash these subpoenas.

43.     The district court heard the motions to quash on June 16, 2017, ten days before [the continued] trial was scheduled to begin on June 26, 2017.

44.     At hearing, Civil Plaintiffs' counsel informed the Court they reached agreement with DCI regarding which documents DCI would produce. DCI's counsel, Jeff Peterzalek, affirmed that agreement.

45.     Jason Carter's counsel was not invited to any meetings or discussions with DCI regarding documents to be produced. The documents Plaintiffs and DCI agreed to produce were the result of private conversations and agreement that deliberately excluded Jason Carter and his counsel.

46.     It was later revealed that documents DCI agreed to produce to Plaintiffs excluded myriad exculpatory evidence known to DCI and known to Ludwick.

47.     The only substantial evidence DCI provided to the Civil Plaintiffs per their agreement was the one item that, without context, inculpated Jason Carter – his fingerprints on the gun safe.

48.     No exculpatory evidence was provided by DCI to the Civil Plaintiffs.

49.     At the time, Jason Carter was unaware of the significant exculpatory evidence that existed in DCI's file by June 2017. No exculpatory evidence was provided until after the civil trial in December 2017.

50.     Defendants' decision to supply inculpatory evidence, and to withhold exculpatory evidence shows an improper motive in meeting with Plaintiffs' counsel and in forming an "agreement".

51.     DCI's and Ludwick's motive in providing misleading evidence to the Civil Plaintiffs for use in the civil trial was to assist the Civil Plaintiffs in achieving a liability verdict against Jason Carter, and to then leverage that finding of liability into criminal charges.

52.     The civil trial took place in December 2017 and resulted in a verdict finding Jason Carter civilly liable for Shirley Carter's death.

53.     Ludwick referred to the civil lawsuit in an email to another DCI employee as a "gift."

54.     Despite being a sequestered witness per court order, Ludwick admitted in criminal depositions he was aware of who was testifying and when they were testifying, and he watched some (or all) of the testimony from the media room attached to the courtroom.

55.     Other law enforcement officers named Ludwick as the individual giving them updates on who was on the stand. In one email to another DCI employee, Ludwick stated Jason Carter was "on the stand now."

56.     Ludwick contacted various media outlets filming the civil trial to obtain videos of the testimony, again, while under an order of sequestration.

57.     The liability verdict was rendered December 15, 2017.

58.     Bull authorized Jason Carter's arrest within hours of the civil verdict.

59.     Jason Carter was arrested and charged with first degree murder two days after the civil verdict, on December 17, 2017.

60.     Based on the totality of information known, or the information that should have been known to investigators on December 15, 2017, there was no probable cause to charge Jason Carter the murder of his mother.

61.     On December 16, 2017, Ludwick signed the criminal complaint which was used to request the arrest warrant for Jason Carter.

62.     Ludwick intentionally provided false and misleading material information in the criminal complaint requesting the warrant.

63.     Ludwick omitted material and necessary information from the criminal complaint which directly weighed on the determination of probable cause.

64.     Defendants were actually aware Jason Carter had an alibi and the timeline excluded Jason Carter as a suspect in the murder of Shirley Carter because, when considered with the evidence showing Shirley Carter died well before Jason Carter discovered her body, a reasonable police officer would have known that Jason Carter could NOT have committed the homicide.

65.     Defendants were aware Jason Carter had no cognizable motive to murder Shirley Carter. Despite claims Jason Carter murdered Shirley Carter because of financial distress, Defendants knew Jason Carter gained nothing financially from Shirley Carter's death. Defendants knew there was no basis to assert and no evidence to show Jason Carter planned to murder Bill Carter.

66.     Defendants created a theory that Jason Carter murdered Shirley Carter because Shirley discovered Jason was having an extramarital affair.

67.     Defendants had no evidence showing Shirley discovered Jason was having an extramarital affair.

68.     The State had evidence that, even if Shirley was aware of the extramarital affair, she would have supported and protected her son.

69.     Defendants were aware there was no forensic evidence implicating Jason Carter in the murder.

70.     Defendants were aware there was no cell tower evidence implicating Jason Carter in the murder, but knowingly made false representations the cell tower data implicated Jason Carter in the murder.

71.     Defendants based their theory of guilt on Jason Carter's allegedly "inconsistent statements," but there were no such inconsistent statements sufficient to establish probable cause, nor did Defendants gain any new information in the civil trial, via testimony or otherwise, which contributed to a legitimate finding of probable cause.

72.     Even while possessing myriad statements and evidence implicating others in the murder, the State doggedly pursued Jason Carter without evidence that implicated him in the murder and refused to investigate leads pointing to other suspects.

73.     In fact, Ludwick and other investigators knew as early as 2015 that Joe Sedlock, Callie Shinn, and John and Joel Followill were being implicated as suspects in the murder by numerous individuals.

74.     Because of their tunnel vision on Carter, Ludwick and the other Defendants never pursued the known and easily obtainable information that would have shown that any potential alibis provided by these suspects could not be corroborated.

75.     Ludwick and the other Defendants performed virtually no investigation or following up on leads provided between early 2016, which is the time period in which the civil wrongful death suit was filed against Jason Carter, and July 2018, when Ludwick and Kious were deposed by Jason Carter's criminal defense team and each were confronted with the myriad exculpatory leads and information that was known to law enforcement previously but never followed up on or otherwise investigated.

76.     Jason Carter later filed a Petition to Vacate the civil judgment after he was criminally charged with the murder and after he began receiving exculpatory information in criminal discovery.

77.     The exculpatory information in the DCI file was known by Defendants, or should have been known by Defendants, at the time of the civil proceedings and could have been used in Jason's defense during the civil trial.

78.     The Petition to Vacate was based on newly discovered evidence that was material and would have changed the outcome of the civil trial.

79.     On May 30, 2018, the Civil Plaintiffs' counsel Mark Weinhardt spoke with the press in response to Jason Carter's Petition to Vacate and stated "his legal team had long been aware of the other suspects from early in the investigation" but said "they were discounted as possibilities based on a 'complex analysis of lots of factors.'" He added "[t]here is nothing of substance new to our side in this motion."

80.     Weinhardt's statements show Defendants knew the information about other more viable suspects, and shared this information with Weinhardt and Bill Carter before the civil trial. Weinhardt and Bill Carter did not share this information with Jason Carter before or during trial, in violation of civil discovery rules.

81.     Weinhardt's statements show Defendants worked with Weinhardt and Bill Carter in the civil prosecution of Jason Carter, sharing information with Weinhardt and Bill Carter about the investigation with the goal of obtaining a civil judgment against Jason Carter.

82.     Detective Kious admitted in deposition that DCI and/or MCSO may have provided Plaintiffs' counsel – at that time, Ron Danks of Pleasantville, Iowa – with questions to ask Jason Carter in his civil deposition.

83.     The above facts show Bill Carter and Civil Plaintiffs were working in concert with the Defendants through the civil discovery and litigation to place Jason Carter under oath, gain information for a future criminal investigation, and exert pressure on Jason Carter.

84.     Defendants' used the civil lawsuit to (1) improperly gather information on Jason Carter using Plaintiffs as agents and co-conspirators, and (2) to provide incomplete and only inculpatory evidence via a private agreement with Plaintiffs to gain a finding of civil liability, which would then be leveraged into criminal charges against Jason Carter.

## B. THE INVESTIGATION INTO SHIRLEY CARTER'S MURDER WAS EGREGIOUSLY INCOMPLETE AND BIASED AGAINST JASON CARTER

### LACK OF KNOWLEDGE – UNKNOWN FINGERPRINT

85.     Ludwick denied basic knowledge of exculpatory evidence tending to show Jason Carter's innocence.

86.     The gun alleged to be the murder weapon was a .270 Remington rifle that was purportedly stored in the unlocked gun safe in Shirley Carter's basement.

87.     The .270 was missing after the murder and recovered bullets were consistent with a .270.

88.     Because it was believed the .270 had been stored in the gun safe on the day of the murder, physical evidence from the gun safe, including fingerprints, was significant.

89.     There is one unknown fingerprint on the gun safe that has never been identified.

90.     In Jason Carter's civil trial, which preceded filing criminal charges, Ludwick testified he was not aware of an unidentified fingerprint on the gun safe, implying to the jury that indeed there was no unidentified fingerprint on the gun safe.

91.     Ludwick's denial of or ignorance of an unidentified fingerprint on the gun safe where the alleged murder weapon was alleged to be located shows either Ludwick's incompetence as an investigator or his failure to investigate exculpatory evidence that did not point to Jason Carter. Neither were the actions of a reasonable police officer or investigator.

92.     At the criminal trial, Ludwick testified, in fact, that he knew about the unidentified fingerprint at the time he testified in the civil trial but it slipped his mind or he did not recall it.

93.     Based on Ludwick's criminal deposition in July 2018, Ludwick did not enter the fingerprint into the appropriate law enforcement database to look for matches.

94.     In fact, it is not known whether the unknown fingerprint was ever entered into the appropriate database.

95.     To the knowledge of Jason Carter, the unknown fingerprint has never been identified.

## INACCURATE AND MISLEADING REPORTS

96.     Ludwick intentionally wrote and submitted reports which were false and inaccurate or did not convey the substance of witnesses' statements.

97.     Ludwick wrote and intentionally submitted false reports which did not convey the substance of law enforcement's statements to witnesses.

98.     Ludwick's written report of an interview with Rex DeMoss indicates DeMoss described Jason Carter as a "hothead." Rex DeMoss later testified: that report was false,

he never described Jason Carter as a hothead, and he did not believe Jason Carter to be a hothead.

99.     Ludwick's written report of an interview with Barry Griffith indicates Griffith recalled a dispute between Michael McDonald and Jason Carter, and Griffith stated Carter was more upset than McDonald. Griffith later testified he told Ludwick the opposite—Carter handled the dispute reasonably and McDonald was more upset than Jason Carter.

100.    Ludwick's written report of an interview with Brian Titus indicates Titus confirmed that, if the operator of a certain tractor started the tractor and was not seated in the operator's seat and activated the PTO, then the audible safety alarm would sound and that safety code would be recorded within the tractor's computer system. The Minutes of Testimony filed in Jason Carter's criminal matter, filed in January 2018, stated the same.

101.    Brian Titus later testified he had realized his mistake and no safety code would be recorded. Titus testified he informed Ludwick of the mistake prior to the civil trial and prior to filing of the Minutes of Testimony in the criminal case. Ludwick intentionally failed to correct this known mistake.

102.    Ludwick did not inform the Marion County Attorney's Office (or anyone else) of the change in evidence.

103.    Ludwick's written report of an interview with Sean Gordon indicates Gordon told Ludwick Jason Carter asked Gordon to call Shirley Carter to ask Bill Carter if Jason

Carter and Bill Carter could "just farm together." Gordon testified he had made no such statement to Ludwick.

104.    Whether Gordon actually made that statement is significant because the State alleged there was discord between Jason Carter and Shirley Carter regarding whether Jason Carter would farm with Shirley and Bill.

105.    Ludwick stated in deposition he only did a second interview with Sean Gordon because he heard Jason Carter's attorneys were going to try to "pin the crime" on Sean Gordon. Ludwick was unable to articulate from whom he heard that information and did not make a record of any such "tip."

106.    Jason Carter's counsel had no knowledge that would lead them to believe Sean Gordon was responsible for the murder and had no intent to "pin the crime" on Sean Gordon.

107.    In May 2017, Melissa Farrell contacted law enforcement and stated she had information about the murder.

108.    Reed Kious of MCSO interviewed Ms. Farrell and wrote a short report on his interview. No audio recording of the interview has been provided.

109.    In deposition, Ms. Farrell indicated the report was inaccurate and omitted specific exculpatory evidence that she provided to Kious. Farrell testified that she informed Kious that Rodney Johnson, a Marion County resident, had a white Kia SUV on his property (a Kia SUV was alleged to be the car used to transport suspects to the scene of the murder on June 19, 2015); Farrell witnessed Johnson rushing around with vehicle seats and tires he was placing into the back of his truck; Johnson told Farrell a woman

told him the Kia SUV was involved in the murder; and John and Joel Followill used the car on the day of the murder.

## LOST AND DISORGANIZED EVIDENCE

110.    Ludwick kept an extremely disorganized file for the murder investigation. The level of disorganization reached the level of negligence, recklessness and willful disregard.

111.    Multiple recordings, reports, and evidence are lost, mislabeled or inscrutable.

## MARCI RUFF'S NOTES

112.     Marci Ruff was interviewed by Ludwick in April 2018.

113.    In her interview, Ruff shows and hands Ludwick a piece of paper on which she wrote notes regarding her knowledge of other suspects.

114.    Video demonstrates Ludwick collected notes from Ruff, but Ludwick testified in deposition he was not sure if he received any notes from her.

115.    Those notes were never provided to Jason Carter.

## CURT SEDDON'S REPORT

116.    On September 28, 2015, Brian Bigaouette of MCSO sent Ludwick a copy of Curt Seddon's notes from the date of the murder. Seddon was one of the first responding officers on scene and interviewed both Bill and Jason Carter.

117.    It was an issue during trial whether Bill Carter or Jason Carter made a statement indicating there were "two holes" at the crime scene (purportedly showing premature knowledge of how many times Shirley Carter was shot).

118.    It was Jason Carter's counsels' belief Seddon originally stated both Jason Carter and Bill Carter made those statements, not just Jason Carter. Seddon testified Jason Carter made that statement, not Bill Carter.

119.    The notes that were sent to Ludwick in September 2015 show Seddon heard both Jason Carter and Bill Carter make the "two holes" statement.

120.    These notes were never officially provided to Jason Carter in discovery but were found in the middle of the criminal trial during a review of Ludwick's emails, which were only provided after a court order requiring their release.

## LUDWICK'S "BOX" OF EVIDENCE

121.    Ludwick repeatedly referred to a "box" of evidence he had in his office containing evidence from the investigation into the murder.

122.    During deposition, Jason Carter's counsel requested Ludwick bring the "box" of evidence to deposition. Ludwick failed to provide this evidence.

123.    On March 1, 2019, the Friday before trial began, Jason Carter's counsel came to MCSO with the purpose of reviewing physical evidence prior to transport of the evidence for trial.

124.    In addition to finding physical evidence never previously identified or seen, Jason Carter's counsel found a box with an evidence log indicating the box contained approximately 93 discs and drives. The box actually contained approximately 80 discs and drives.

125.    No one knows what happened to the 13 missing discs and drives.

126.    The evidence log indicated the box was delivered to MCSO in February 2019 by Ludwick.

127.    Marion County Attorney Ed Bull received an email around that time showing he was aware the box of evidence was delivered.

128.    Many of the discs were mislabeled in the evidence log, which required Jason Carter's counsel to open every disc to determine what the disc actually contained.

129.    Certain discs were listed in the evidence log, but were not in the box (and therefore never received).

130.    Some discs were damaged and unreadable.

131.    Disc 76 was received by defense counsel, but was not listed on the evidence log.

132.    Other numbers are skipped on the evidence log from the box.

133.    Numerous items from a previously-filed Motion to Compel (filed by the defense) either were on the evidence list or were within the discs in the box; however, numerous items from the Motion to Compel remained unprovided.

134.    Jason Carter's counsel was at the Marion County Sheriff's Office for 10.5 hours just three days before trial was set to begin in another county, reviewing evidence that had never been provided to the defense.

**RORY PEARSON'S WRITTEN INTERVIEW REPORTS/AUDIO OF INTERVIEWS**

135.    Defense counsel learned in investigation that law enforcement interviewed Rory Pearson.

136.    Multiple individuals implicated Rory Pearson in the murder.

137.    According to law enforcement, Rory Pearson was interviewed multiple times; however, not all interviews were recorded.

138.    On June 8, 2018, Ludwick sent an email looking for Rory Pearson's written interview.

139.    Ludwick and Kious admitted not knowing who kept which reports.

140.    Rory Pearson's name came up repeatedly as someone who was either directly involved in the murder of Shirley Carter or as someone who had direct knowledge of the murder.

141.    At least one person told law enforcement Rory Pearson confessed to murdering Shirley Carter.

142.    There is only one audio recording of an interview with Rory Pearson, but Detective Kious admitted he interviewed Pearson multiple times. There are no provided reports to the additional interviews.

143.    The substance of the interviews, which Jason Carter believes may have contained significant exculpatory information, was lost to Jason Carter and he was deprived of the opportunity to use them in his defense.

## MISSING AUDIO FILES

144.    The defense repeatedly requested missing audio files throughout discovery. Some audio files were eventually obtained, and others were not.

145.   On January 16, 2018, Ludwick sent an email to a DPS employee regarding missing audio files. He stated: "The missing audio files are causing me problems…I'm working on them, but we might need to say 'maintained by MCSO' if I can't get them to copy over."

## MISSING DOCUMENTS

146.   The defense repeatedly requested documents/audio/video that was listed as existing in the DCI case report but was not provided to the defense in response to the court-ordered discovery.

147.   This list was provided to Bull and forwarded by him to Kious and Ludwick with comments. It shows the following missing documents/audio/video:

a.   Voicemail recording from Christine Rider, a person who may have had knowledge about the murder of Shirley Carter;

b.   Report of interview with Mike McCollum,

c.   Report of interview with Pyburn,

d.   Report/audio of interview with Scott Pace;

e.   Report of interview with Tara Morris.

148.   This list showing lost interviews/audio was not provided to Jason Carter in discovery, but rather, was found by defense counsel while reviewing hundreds of Ludwick's emails in trial.

## C. WITNESS MANIPULATION – JASON CARTER'S FAMILY

149.   Through investigation and litigation, Ludwick intentionally sowed discord and distrust within Jason Carter's family.

150.    All of Jason Carter's family members initially stated it was not possible that Jason Carter was responsible for his mother's death.

151.    But by the end of the investigation because of the intentionally false and misleading statements of Ludwick, many of Jason Carter's family members were convinced Jason Carter murdered his mother.

### JANA LAIN

152.    Jana Lain is Jason Carter's sister and is Shirley Carter's daughter.

153.    She was interviewed by Ludwick on June 22, 2015, while Jason Carter was in an eleven-hour interview conducted by DCI.

154.    Ludwick begins his conversation with Lain by telling Lain that Jason Carter was not honest with the DCI in his June 19, 2015 interview. This statement was intentionally and knowingly false.

155.    Ludwick and Lain discuss a live .270 round which was left in the lip of the gun cabinet door where the alleged murder weapon is alleged to have been located.

156.    DCI failed to collect that live round when investigating the crime scene.

157.    Ludwick tells Lain that DCI took hundreds of pictures of the crime scene. Ludwick then asks Lain if it "would surprise [her]" if in DCI's pictures the live .270 round was not in the lip of the gun cabinet, intentionally and falsely implying it was planted there by Jason Carter.

158.    Despite knowing the live .270 round was in DCI's photographs (therefore, not planted after photographs), Ludwick implies it was put there by Jason Carter by asking

questions about whether Jason Carter was ever alone in the basement after the DCI investigated the crime scene.

159.    Lain questions Ludwick and asks him if the .270 round was in the pictures. Ludwick does not answer but states "would it surprise you if it wasn't?" Lain replies "someone put it there, you're kidding…" and Ludwick replies "I'm just asking the question."

160.    Ludwick knowingly allowed Lain to walk out of the interview room with the impression Jason Carter planted evidence at her mother's murder scene. Lain testified that it was her impression Ludwick was indicating the evidence was planted.

161.    Lain left that meeting and told her father, Bill Carter, she learned from Ludwick that Jason Carter planted evidence at the crime scene.

162.    Lain testified she believed Ludwick's intention was to alienate Jason Carter from the rest of his family.

**BILL CARTER**

163.    On the date of the murder, and for several following days, Bill Carter was adamant Jason Carter could not and would not have murdered his mother.

164.    On the evening of June 22, 2019, as previously stated, Jana Lain informed Bill Carter (based on what Ludwick said) Jason Carter planted evidence at the crime scene.

165.    Shortly thereafter, Bill Carter became convinced Jason Carter was guilty of murdering his mother.

166.    Ludwick testified at trial he spoke with Bill Carter "many, many" times over this investigation.

167.    After meeting with DW Lain (Bill Carter's son-in-law) and Bill Carter, Ludwick gets into his police vehicle with another law enforcement officer, believed to be Jon Thorup.

168.    Ludwick states to Thorup that Billy[3] is now "on board" and says, "now we got Billy." He then states his "biggest concern is that Billy could flip." Thorup asks if Ludwick's body mic is still on, and the exchange abruptly ends as Ludwick turns off his mic.

### BILLY DEAN CARTER

169.    Billy Dean Carter is Jason Carter's brother. He is a plaintiff in the wrongful death action filed against Jason Carter.

170.    Billy Dean initially was adamant Jason Carter was not responsible for the murder.

171.    Billy Dean testified the reason he believed Jason Carter murdered Shirley Carter was because Ludwick told Billy Dean that Jason Carter implicated Billy Dean was responsible for the murder – a knowingly false statement.

172.    Billy Dean was to be deposed in the criminal matter and a subpoena issued for his deposition.

173.    On November 30, 2018, Krissy Link from the Marion County Attorney's Office emailed Ludwick to ask how serving Billy Dean had gone, asking, "[h]ow was the beer and therapy?"

---

[3] Bill Carter is often referred to as "Billy" in the Marion County community and in police reports.

174.    On December 3, 2018, Ludwick replied "[o]h it was wonderful! I'm his best friend in the world."

175.    Billy Dean is a man with some disabilities and has stated on multiple occasions he is lonely and just wants someone to talk to.

176.    Ludwick's manipulation is illustrated by mocking Billy Dean afterward, showing the intent was not therapeutic.

### SHELLY CARTER

177.    Shelly Carter is Jason Carter's wife.

178.    In June 2015, Shelly Carter was at the Marion County Sheriff's Office because her son, Chase Carter, was being interviewed by law enforcement regarding the murder.

179.    Ludwick threatened Shelly Carter by telling her Jason Carter was going to be charged with the murder, and she better "get on the bus" or she would "be under it."

180.    When Shelly Carter provided her fingerprints, Ludwick repeatedly taunted her even as counsel requested he stop addressing Shelly Carter.

### D.  WITNESS INTIMIDATION

### WENDY BONNETT

181.    Ludwick conducted an interview with Wendy Bonnett in January 2018. In her interview, Wendy Bonnett stated Joel Followill, John Followill, and Joseph Sedlock shot and killed Shirley Carter.

182.   Bonnett stated she was in a car with Jordan Durham several weeks after the murder and heard Joel Followill confess to Jordan Durham that he shot Shirley Carter.

183.   The interview was audio recorded. The corresponding written report omits significant information including Ludwick's attempt to intimidate Bonnett by falsely telling her Jason Carter's defense team was aware of "the whole Joel and John Sedlock story," and his indication Jason Carter's defense team wanted to paint the picture to the jury that Jason Carter was innocent, and that Joel, John, **and *Bonnett*** were actually responsible for the murder. Again, this was at a time when attorneys for Carter were unaware of the Followills or Bonnett.

184.   Ludwick stated to Bonnett it would be hard for a jury to believe Jason Carter was responsible for the murder but it would be easier for Jason Carter's defense team to 'pin the crime' on Joel, John, **and Bonnett.**[4]

185.   Ludwick further told Bonnett she needed to prove where <u>she</u> was the day of the murder not because he thought she was involved, but because Jason Carter's defense team would paint a picture implicating her.

186.   After Ludwick made these statements to Bonnett, the entire tone of the interview changed, and Bonnett was defensive. She stopped sharing information about the Followills or Sedlock and appeared to begin questioning her own knowledge. (and Ludwick did not inquire about her knowledge.)

---

[4] Again, at the time of this interview between Ludwick and Bonnett, Defense counsel had never heard the name Bonnett and were unaware of the multiple implications of the Followills. Ludwick, however, was well aware since 2015 that multiple people had implicated the Followills in the murder.

187.    Ludwick informed her he knows for certain Jason Carter murdered his mother, and that Bonnett's information was wrong.

188.    Further, Jason Carter's defense team never heard of Wendy Bonnett and had no knowledge she had information regarding the murder.

189.    Any information Jason Carter's defense team could have obtained from Wendy Bonnett was lost after Ludwick made false assertions to her that Jason Carter's defense team intended to allege Bonnett was involved in the murder.

190.    In his July 2018 deposition and contrary to reasonable police procedures, Ludwick stated he did not remember what information Wendy Bonnett provided to him and he could not think of action he took to confirm or refute information Bonnett provided.

**JASON FORD**

191.    In an audio-recorded interview with Jason Ford, an EMT at the crime scene, Jason Ford stated it was clear to him that Shirley Carter died at least an hour or two before Ford arrived on scene.

192.    When Ford offers his reasoned opinion, Ludwick can be heard immediately attacking Jason Ford's qualifications for determining time of death (knowing if Shirley Carter died an hour or two before Jason Ford arrived, Jason Carter would be excluded as the killer because he was on video elsewhere).

193.    Ludwick's tone was aggressive, confrontational and unreasonable and not designed to gain evidence but instead designed to undermine objective evidence that did not fit Ludwick's theory of the crime.

**TAYLOR JONES**

194.    Reed Kious interviewed Taylor Jones after Jason Carter's civil defense team filed a motion requesting the Court vacate the civil judgment and listed Taylor Jones as someone who was not interviewed, but should have been interviewed. This interview is audio recorded.

195.    In the interview, Jones is confused about why Kious called him and states he had nothing to do with the murder. Kious asks him where he was in June 2015 and Jones again states he had nothing to do with the murder.

196.    Kious says he "knows" Jones had nothing to do with it, but that doesn't mean the defense isn't going to try to prove Taylor murdered Shirley Carter.

197.    Once again, law enforcement intentionally and falsely told a material witness that Jason Carter's defense team intended to prove that witness was involved in the murder of Shirley Carter. As with Wendy Bonnett, any potential exculpatory evidence was lost.

**E.  WITNESS MANIPULATION – SHANE KARAS**

198.    On June 22, 2018, law enforcement was provided a tip involving Shane Karas.

199.    Karas informed Kious that Joe Sedlock admitted directly to Karas that Sedlock murdered a person Karas believed to be Shirley Carter.

200.    Joe Sedlock told Karas he did it with a gun, and he was working with DCI on where to find the gun.

201.    Although Karas never states or implies Sedlock was making up the confession, Detective Kious asked Karas in his interview "if you think he was making it up, why would that be?"

202.    Kious then tries to get Karas to state the murder weapon was anything but a gun, suggesting a knife, a rope, and poison.

203.    Karas corrected Kious and stated definitively, "no, it was a gun."

204.    Kious's statements appear to attempt to manipulate Karas into stating Sedlock was "making up" his confession. Kious also tried to manipulate Karas into stating the weapon was anything but a gun, in an attempt to discredit Karas' statements.

## F.  FAILURE TO INTERVIEW WITNESSES

205.    During Ludwick's three depositions and trial testimony, Ludwick falsely denied knowledge of many individuals tying John Followill, Joel Followill, Joe Sedlock, Matt Kamerick, and Callie Shinn to the murder, despite more than thirty reports pointing to those suspects.

### CHRISTA NORRIS

206.    Christa Norris testified she provided information regarding the murder to Detective Kious. Neither Jason Carter nor his legal team received a report regarding this interview.

207.    In deposition, Ms. Norris testified she told Detective Kious that Nichole Sedlock told Norris about Joe Sedlock's involvement in the murder of Shirley Carter, including her testimony indicating that Ms. Sedlock directly admitted to:

a. helping Joe Sedlock cover up the murder (corroborated by statements from other witnesses);

b. knowing Joe Sedlock was certainly guilty of the murder;

c. hearing Joel Followill had nightmares about the murder (corroborated by statements from other witnesses);

d. knowing Matt Kamerick and Michelle Daniels helped Rory Pearson get out of town right after the murder (corroborated by other statements;

e. hearing where the murder weapon was stored;

f. hearing Joel and John Followill and Joe Sedlock were going to get drugs or patches from Shirley Carter's home (corroborated by other statements), but wasn't sure if they obtained everything; and

g. hearing Joel and John Followill and Joe Sedlock knew Bill Carter and Shirley would go out for coffee every morning (true).

208.    All information was exculpatory and relevant, and yet, Jason Carter's team never received a written report or audio recording of this interview and this information was never included in a request for an arrest warrant even though such evidence would have been extremely relevant to the determination of probable cause.

209.    After Norris's deposition, the State provided an email from Norris, but there was no official written report of the interview, and Jason Carter would never have learned of the interview had counsel not deposed Christa Norris less than one month before trial.

## MICHELLE DANIELS

210.    Just prior to the criminal trial, Jason Carter's counsel received a thumb drive with copies of emails Ludwick sent throughout investigation. The thumb drive was provided after Jason Carter filed a Motion to Compel and the district court ordered disclosure of the emails.

211.   The provided emails include an email sent July 16, 2018, regarding Ludwick's July 13, 2018 interview of Michelle Daniels.

212.   This email was only discovered in reviewing hundreds of emails, and a report was never sent to Jason Carter's counsel in discovery. The email was sent from Ludwick to himself.

213.   This email was replete with typos and as a result sometimes difficult to comprehend, but included the following relevant, exculpatory information from Daniels:

    a.  Daniels was confident her car was driven to the crime scene of the murder after the car was stolen by Daniel's sister.

    b.  Matt Kamerick had several stolen rifles he was trying to sell for money, including a black rifle (relevant because the gun believed to have been used to murder Shirley Carter was a .270 black rifle).

    c.  Callie Shinn (whose name comes up repeatedly as someone who was either present or has direct knowledge of the murder) told her Joel Followill shot Shirley Carter because she would not stop screaming (consistent with other reports).

    d.  Daniels was confident a grey Grand Prix and her Kia SUV were driven to the crime scene on the day of the murder.

    e.  Joel and John Followill "mailbox hop" and they knew Shirley Carter was getting drugs in the mail because her nephew, Jeremiah Laird had that information. (Plaintiff notes Jeremiah Laird is not Shirley Carter's nephew, but is the nephew of Sherry Carter, who was, upon information and belief, receiving treatment drugs in the mail).

    f.  John Followill called Jeremiah Laird from jail in Marion County and told him to get rid of all the guns that John sold him. John knew the cops were onto them and they were going to go to Jeremiah Laird's house.

    g.  Jordan Durham told Daniels that John Followill said he shot Shirley Carter.

214.   Neither this report nor the information contained in the report were ever shared with Jason Carter's counsel until his counsel discovered the report by reviewing Ludwick's emails.

215.   Jason Carter's counsel was generally aware, however, Michelle Daniels participated in several unreported interviews because Michelle Daniels testified about the interviews.

216.   Daniels testified about a hard drive which contained a video of Callie Shinn, Jason Beaman, Jeremiah Laird, and John Followill talking about the murder and planning what they would say to law enforcement.

217.   She stated it sounded like they were involved in the murder, Daniels testified Joel stated he had to shoot Shirley because she saw his face, and Joe Sedlock cleaned up the crime scene after the murder.

218.   Daniels testified she told Detective Kious about the video but he did not believe her.

219.   She further testified she told all of this to Ludwick.

220.   Daniels stated Wendy Jane had "a lot of information" about the murder, and she told Kious and Ludwick about Wendy Jane.

221.   Wendy Jane was never interviewed by law enforcement, or if she was, a report was never provided to Jason Carter's counsel.

222.   No reports were ever provided to Jason Carter's counsel regarding statements from Michelle Daniels to Ludwick or to Kious. Such recordings were only inadvertently discovered by reviewing Ludwick's emails.

**ANGELA JOHNSON**

223.   On April 15, 2016, a DCI receptionist emailed Mike Motsinger regarding a tip received from Angela Johnson.

224.   Ms. Johnson called DCI to report she learned information about the death of Shirley Carter, including names and where the weapon used was disposed.

225.   Motsinger forwarded the email to Ludwick the same day, instructing Ludwick to follow up.

226.   Ludwick unreasonably failed to follow up this information.

227.   Ms. Johnson was not interviewed by DCI until the middle of Jason Carter's criminal trial, *after* the State rested its case.

228.   Ludwick testified during trial he was aware she was interviewed on March 17, 2019, and he had lunch with Detective Kious on Monday, March 18, 2019, but they did not discuss that testimony/information.  This testimony is difficult to believe under the circumstances.

**JEREMIAH LAIRD**

229.   On November 8, 2015, Officer Nicholas Gilchrist emailed Detective Kious and advised him Shawn Gerdom indicated Mike Poffenbarger told Gerdom that Jeremiah Laird had the gun that was used in the murder.

230.   Kious forwarded the email to Ludwick and stated he'd run the lead out the next day. Ludwick asked Kious the next day how the investigation went.

231.   Kious replied he interviewed Poffenbarger and the conversation was non-descript, and asked if Ludwick wanted him to follow up with Jeremiah or Shawn Gerdom.

232.   Ludwick declined.

233.   Jeremiah Laird's arose repeatedly as a person who had either been involved in the murder or as someone who disposed of the murder weapon.

234.   As of November 8, 2015, Ludwick believed Mr. Laird was interviewed. Detective Kious corrected that presumption and told him he was not, in fact, ever interviewed.

235.   Jeremiah Laird is now deceased.

## UNKNOWN TIPSTER FROM OCTOBER 23, 2015

236.   On October 23, 2015, an unknown individual called the Marion County Sheriff's Office and advised "the rumor among the kids in Knoxville is that Joel Followill killed Mrs. Carter."

237.   Ludwick addressed the tip by writing "I think we have looked hard enough at Followell [sic] for now unless new information comes forward."

238.   The defense did not receive a copy of this tip in discovery other than within hundreds of emails received during trial.

239.   Unreasonably, this tipster was never interviewed.

## AMBER SHINN

240.   Ludwick's emails, turned over during trial by court order, contained an email Ludwick sent to himself on December 6, 2018, containing a report of his interview with Amber Shinn.

241.    Amber Shinn's name came up regularly in investigation as someone who may have knowledge of the murder and of involvement by the Followill brothers and by Joe Sedlock.

242.    This report was never provided to the defense in discovery but was discovered by reviewing Ludwick's emails.

243.    This report contained important information, including Ms. Shinn's statement that Callie Shinn (another person of interest to the defense) "tried really hard to convince [Amber] that she did drive to the crime scene on the day of the homicide."

244.    One person of interest trying to convince another person they drove to the crime scene on the day of the murder is important, exculpatory information because it begs the question – why would any innocent person try to convince another person of interest that the other person was present at the crime scene?

245.    The report indicates the video of the interview contains a more complete version of the facts; however, this video was never provided to the defense.

246.    Amber Shinn is now deceased.

### G. LACK OF FOLLOW-THROUGH ON INTERVIEWS - GENERALLY

247.    Throughout the years between the murder and the criminal trial, Ludwick unreasonably and intentionally failed to interview many important witnesses with exculpatory information. Many leads brought to his attention in 2015 were not followed by either MCSO or Ludwick until 2018 or 2019. The following are examples of lack of follow through.

## JASON BEAMAN

248.    On October 15, 2015, Joe Sedlock gave statements to law enforcement officers indicating he knew what type of gun was used to murder Shirley Carter and stating Jason Beaman was his source of information about the rifle used in the murder.

249.    In the fall 2015 (exact date unknown because law enforcement did not know the exact date the interview was conducted and did not write a report of the interview until months or years after the interview), Tameka Jenkins told law enforcement Jason Beaman stated "they weren't going to find the gun" while discussing the murder.

250.    Kaleb Marshall told law enforcement he has repeatedly heard Jason Beaman was involved in the murder.

251.    Christine Rider told law enforcement Jason Beaman is a past accomplice of Joel Followill (although not in this case, according to Rider).

252.    Charity Roush told law enforcement Jason Beaman and Joe Sedlock were trying to get rid of Callie Shinn's Bonneville, which she believed was used in connection with the murder.

253.    Jason Beaman's phone number appears in the cell tower dump showing him in the vicinity of the crime scene on the date of the murder.

254.    Ludwick testified he previously had "run" Beaman's number through the cell tower dump and it was not there. - This was knowingly false.

255.    Although Ludwick became aware of Beaman's possible connection to the crime in October 2015, Beaman was not interviewed until May 16, 2018.

256.    In July 2018, when questioned in deposition, Ludwick did not know Beaman's connection to the case.

## CHRIS BREES

257.    In April 2016, law enforcement received a tip that the murder weapon used to kill Shirley Carter may be hidden in Chris Brees' home.

258.    Chris Brees was not interviewed until June 1, 2018.

259.    On December 5, 2018, Detective Kious from MCSO went to Brees' house. This exchange is audio-recorded. He immediately tells Brees he is there following up on a "BS tip."

260.    Brees immediately knows Kious is asking about the gun hidden in his home. Kious does not ask how Brees knows Kious has a tip that the gun is hidden in his home.

## JUSTIN FLESHER/JEREMY MORRIS/MORRIS ROOFING

261.    Justin Flesher is a Marion County resident who was employed by Morris Roofing on the date of the murder.

262.    Morris Roofing re-roofed the Carter home prior to the murder.

263.    At some time, John Followill was employed by Morris Roofing.

264.    Law enforcement neither confirmed nor asked Jeremy Morris (the owner of Morris Roofing) whether John Followill was present when re-roofing the Carter home.

265.    Whether John Followill re-roofed the Carter home was relevant because it provided John Followill an opportunity to observe the home and the Carters' habits.

266.    Such presence would explain how John Followill knew Bill and Shirley Carter would leave their home to get coffee each morning. (as stated by Michelle Daniels).

267.    As of July 2018, Ludwick believed Jeremy Morris was a neighbor to the Carters and was unaware of the significance of Jeremy Morris as a witness.

268.    As of July 2018, Ludwick believed Jeremy Morris was a suspect because, Ludwick claimed inaccurately, "Jason Carter says he [murdered Shirley Carter]."

269.    During the criminal trial, Ludwick testified he did not believe John Followill worked for Morris Roofing while Morris Roofing re-roofed the Carter home because John Followill told him he had never been to the crime scene.

270.    Unreasonably, Ludwick never confirmed John Followill's dates of employment at Morris Roofing.

271.    Ludwick falsely and intentionally testified in trial that he asked Jeremy Morris for John Followill's employment records the date that Ludwick interviewed Morris. The audio from that interview shows Ludwick did not request those records.

272.    When pressed at trial, Ludwick admitted, at the time of Jeremy Morris's interview, Ludwick may not have been aware John Followill was an employee of Morris Roofing.

**KORY FORD**

273.    On June 1, 2018, law enforcement received a tip that Kory Ford was involved in the disposal of the murder weapon.

274.    Law enforcement did not interview Kory Ford until November 13, 2018, five months after the tip was received, and after Jason Carter's defense team asked law enforcement in depositions why Kory Ford had not been interviewed.

275.    Law enforcement interviewed Kory Ford a second time on February 14, 2019 (three weeks before trial was scheduled to begin).

276.    During his February 2019 interview, Kory Ford told law enforcement Charity Roush bought a car from Joe Sedlock and Callie Shinn around the time of the murder.

277.    Kory Ford stated he heard Joe Sedlock admitted to murdering Shirley Carter.

278.    Kory Ford stated Charity Roush told him Joe Sedlock confessed to murdering Shirley Carter.

**EMILY GULLION**

279.    In October 2015, law enforcement interviewed John Followill.

280.    John Followill claimed he was with Emily Gullion on the date of the murder.

281.    Unreasonably for a known and named suspect in a murder investigation, Defendants did not interview Emily Gullion until almost three years later.

282.    In this interview, Detective Kious immediately tells Ms. Gullion she is John Followill's alibi for June 19, 2015.

283.    Gullion denied knowledge of where John Followill was on the date of the murder.

284.    Gullion described a conversation she had with John Followill while he was incarcerated where she asked him if he was involved in the murder.

285.    Gullion told Detective Kious that John Followill did not answer her, but then said he might have said "absolutely not" when she asked him, but she was not sure.

286.    Gullion remembered John Followill blaming Joe Sedlock and Christa Norris for the murder, and said John Followill told her the murder was over "pain patches."

287.    In July 2018, when questioned by Jason's defense counsel, Ludwick testified Gullion was someone who may have been interviewed by Kious, did not know when she was interviewed, did not know if the interview was recorded, and did not recall anything about her.

288.    When Detective Kious was asked similar questions, he testified that, based on his interview with Gullion, he did not believe John Followill was involved with the murder, and when he spoke with Gullion, she corroborated most of John's "story."

289.    At the time Detective Kious knowingly and falsely testified Gullion corroborated John Followill's alibi, defense counsel did not hear the audio of her interview, in which she clearly does not corroborate John Followill's alibi, but rather says she does not know where he was on June 19, 2015.

290.    Detective Kious admitted in his July 2018 deposition that Gullion was on his list of people he needed to follow up with after speaking with John Followill in July 2015, that he did not interview Gullion until April 2018, that he did not have a good excuse for why he had not interviewed Gullion, that he should have interviewed her earlier, and that

the reason he should have interviewed her is she was the only person who would be able to corroborate John Followill's alibi.

## CHARITY ROUSH

291.   In 2015, early in the investigation, Charity Roush was identified in multiple witness reports as someone with knowledge of the murder.

292.   One witness alleged the Followills and/or Joe Sedlock paid Roush $100 to clean "the evidence" of the murder out of their car.

293.   As of July 2018, Ludwick admitted he did not know if Roush had ever been interviewed, but thought Detective Kious may have interviewed her. At that time, Jason Carter's defense team had no evidence Roush had been interviewed and no corresponding report of an interview.

294.   While under oath in December 2018, Detective Kious admitted he did not interview Roush until after his July 2018 deposition.

295.   At the December 2018 hearing, Jason Carter's defense team learned Kious interviewed Roush on November 13, 2018, despite having been aware of her since 2015.

296.   When Roush was interviewed in November 2018, she provided exculpatory information, including statements that:

> a. Roush bought a Bonneville from Callie Shinn with Joe Sedlock facilitating the sale.
>
> b. At the time of sale, Roush's ex-husband was living with Jason Beaman and Joe Sedlock at Beaman's home. Roush's ex-husband told Roush they were trying to get rid of the car.

c.  The report, written by Detective Kious, indicates Roush stated most of what she heard was "gibberish." The audio recording of the interview shows this is not what Roush said.

d.  Roush directly overheard Joe Sedlock say he murdered Shirley Carter.

e.  Joe Sedlock told Roush he had to tell over one hundred people he murdered Shirley Carter so he would not get punished for the crime. In other words, Sedlock made himself a "usual suspect," knew rumors would be swirling, and hoped law enforcement would dismiss them as just that–rumors and hearsay.

f.  Sedlock told Roush the Followill brothers were involved in the murder.

g.  Callie Shinn drove the car to the murder and waited down the road.

h.  Joe Sedlock told Roush they were supposed to be getting prescription medication that was coming in the mail and something went wrong.

i.  Joe Sedlock told Roush they got startled by Shirley Carter, a gun went off accidentally in Joel Followill's hand, and Sedlock went back and shot Shirley again because she saw them.

j.  The report of this interview falsely states Roush unequivocally stated Sedlock and the Followills escaped through a window of the Carter home. The audio recording of the interview shows this is not what Roush said.

## NICHOLE SEDLOCK

297.   On September 4, 2015, Joe Sedlock told law enforcement his wife, Nichole Sedlock, had knowledge of the Followills' involvement in the murder.

298.   Christa Norris testified in deposition that she told Detective Kious Nichole Sedlock told her about Joe Sedlock's involvement in the murder, including Ms. Sedlock

admitting to helping Joe Sedlock cover up the murder, an assertion corroborated by statements from other witnesses.

299.   Norris further testified Ms. Sedlock told her Joe Sedlock was certainly guilty of the murder, she heard Joel Followill had nightmares about the murder (corroborated by statements from other witnesses), Matt Kamerick and Michelle Daniels helped Rory Pearson get out of town right after the murder (corroborated by other statements), she heard of a place where the murder weapon was stored, and she heard the Followills and Joe Sedlock were going to get drugs or patches from Shirley Carter's home (corroborated by other statements), but wasn't sure if they obtained everything, and further she heard the Followills and Joe Sedlock knew Bill and Shirley Carter would go out for coffee every morning (true).

300.   Unreasonably for a high-profile murder investigation, Defendants did not interview Nichole Sedlock until December 2018, more than three years after becoming aware she might have knowledge about the Followills' involvement in the murder.

**KEVIN WELDON**

301.   At an unknown point in time, Defendants became aware Kevin Weldon may have information about the murder.

302.   All dates and initial statements are not recorded in reports.

303.   When Weldon was interviewed, he stated around the time of the murder, he, Kaleb Marshall, and his mother Lisa Weldon were at Weldon's home when Rory Pearson was hysterical.

304.    Pearson told Weldon he'd done something "really wrong" and kept asking how he was going to get the stains off of his hands.

305.    Pearson told Weldon he "killed her."

306.    Pearson further stated he was with the Followills "that night" and that is who dropped him off at Weldon's home.

307.    Weldon stated Pearson said "I didn't mean to," "she wouldn't shut up," "she wouldn't stop screaming," "how am I ever going to get these stains off of my hands," and "how am I ever going to get these stains off my brain."

308.    Weldon further stated he believed Joe Sedlock gave the murder weapon to a man named Dennis Bachman to destroy and he overheard Sedlock tell Bachman "it better have been taken care of."

309.    Unreasonably, Defendants did not follow up on this information until shortly before Jason Carter's criminal trial.

## RORY PEARSON

310.    Defendants claimed to interview Rory Pearson several times over the phone because he moved to Wyoming.

311.    Despite Defendants' claims it interviewed Pearson on multiple occasions, there are no audio recordings and no written reports of these interviews, other than one interview from December 2018.

312.    Pearson was never called into MCSO for questioning, was never fingerprinted, and his mother's home never investigated to see if it held the murder weapon.

313.    At deposition in July 2018, Ludwick was not sure if Pearson left the state shortly before or shortly after the murder.

314.    Detective Kious admitted in his July 2018 deposition that nothing eliminated Pearson as a suspect "other than talking to him."

## MELANIE AND JACOB SHIVES

315.    On November 2, 2017, Melanie Shives called MCSO.

316.    Melanie Shives stated Joe Sedlock and Callie Shinn were responsible for the murder. She further stated the gun used was stolen from Amber Shinn's father (Roger Shinn) by Joe Sedlock.

317.    On June 1, 2018, Melanie Shives called law enforcement again and stated the source of her information was her son, Jacob Shives.

318.    Unreasonably, Defendants never interviewed Jacob Shives.

## DAVID JOHNSON

319.    At the time of the murder, David Johnson worked at the Milo Meat Locker in Milo, Iowa, and drove the road that runs past Bill and Shirley Carter's residence as he drove to and from work.

320.    On the morning of the murder, Johnson drove past the Carter residence at approximately 10:30 am.

321.    At that time, Johnson saw a light blue car sitting along the road in the vicinity of the Carter residence.

322.   Johnson got a good look at the driver of the vehicle, so much so that he considered stopping to ask whether the driver needed assistance.

323.   Johnson felt the driver's appearance indicated the driver did not want assistance.

324.   Johnson then met a red pickup truck also in the vicinity, traveling at a high rate of speed.

325.   Johnson noticed both vehicles were lacking front plates. Other than seeing the blue car at a stop sign along that road several weeks prior to the murder, he had never, and had not seen again as of his deposition in February 2019, seen either vehicle on that road.

326.   When Johnson saw the news about the murder the following day, he called law enforcement to report what he saw.

327.   Johnson was thereafter interviewed by Warren County law enforcement, and again by Defendants.

328.   Johnson told Defendants he felt he could identify the driver of the blue car from photographs.

329.   Defendants never followed up with Johnson to show him photographs, line-ups, or to ask for further information.

330.   After Jason's criminal trial, his defense counsel learned the blue car Johnson observed was potentially owned by Joe Sedlock.

## H.  FAILURE TO INVESTIGATE STATEMENTS MADE BY BILL CARTER

331.   Bill Carter made false statements to Defendants that he loaned Jason and Shelly Carter a significant amount of money several years before the death of Shirley Carter.

332.   The State alleged Jason Carter had a financial motive to murder Shirley Carter.

333.   As of April 2016, Ludwick had not confirmed whether what Bill stated was true, despite Shelly Carter testifying otherwise in her Rule 5 interview.

334.   On April 4, 2016, DCI Agent Mike Motsinger emailed Ludwick and specifically addressed this issue. He asked Ludwick to prepare "what have we done to rule Bill out" and asked him what DCI did "to back up Bill's statements he had been giving Jason $100,000 to $150,000 a year because [Jason] was in financial trouble." He further asked if DCI had anything to support Bill's statements.

335.   The emails provided to Jason Carter's counsel show Ludwick never replied to Agent Motsinger or provided any information on steps taken to "rule Bill out."

336.   The facts and evidence contradict Bill Carter's statements. Defendants possessed all of Bill's and Jason's financial records which showed no such transactions, and yet, the fact that Bill lied to Defendants about how much money he was lending to Jason were not investigated as of April 4, 2016.

**337.**   A reasonable law enforcement officer would have questioned what Bill Carter's motivation was in lying about loaning Jason significant sums of money, especially given Bill Carter had both motive and opportunity to kill Shirley Carter himself.

**I.  LACK OF KNOWLEDGE OF JOHN AND JOEL FOLLOWILL'S CRIMINAL HISTORIES AND INACCURATE TESTIMONY REGARDING THOSE HISTORIES**

338.   Ludwick intentionally and falsely testified Joel and John Followill were involved in a number of burglaries, but they were not violent individuals and, while they had been violent with each other, they had "never" been violent toward anyone else.

339.   Ludwick falsely testified he looked at their criminal histories in detail.

340.   Later in testimony, Jason's defense team asked Ludwick if he was aware Joel Followill had convictions for harassment, four assaults, two domestic assaults, and burglary second degree.

341.   Ludwick responded he was aware of those convictions.

342.   Jason's defense team further asked if he was aware John Followill had at least two convictions for assault, and Ludwick admitted he knew John Followill had assaults on his record.

343.   Ludwick's statements directly contradicted his earlier testimony that neither Followill had a history of violence against anyone except each other.

344.   Had Jason Carter's defense team not specifically researched the criminal history of the Followills and asked Ludwick about it during testimony, the jury would have been left with the false impression that the Followills have no history of violent crime.

**J.  CELL PHONE TOWER DATA MISREPRESENTATIONS**

345.   In July 2018, Ludwick intentionally and falsely testified he tested the cell phone numbers for Joe Sedlock against the local cell phone tower data and Sedlock's numbers did not appear.

346.    In December 2018, Ludwick admitted, despite receiving multiple reports implicating Joe Sedlock in the murder of Shirley Carter, as of his July 2018 deposition he had not compared Sedlock's cell phone to the cell tower in the area of the murder.

347.    In Jason Carter's criminal trial, Ludwick falsely testified he compared all of Sedlock's numbers available through government agencies with the cell tower records for the area of the murder, and none appeared on the records.

348.    Jason Carter's defense counsel then showed Ludwick a financial affidavit Sedlock filed with an Iowa court in June of 2014. The document had two phone numbers listed for Sedlock. Sedlock publicly filed three separate documents listing the same phone number. Nichole Sedlock, Joe Sedlock's wife, also listed this number on publicly-filed financial affidavits.

349.    That phone number appears on the cell tower data, showing Sedlock's phone received a call from someone in the area of the Carter home at 9:36:02 AM.

350.    In July 2018, Ludwick falsely testified he compared the phone numbers of Joel and John Followill and Matt Kamerick with the tower data and their numbers did not appear in the tower records for the area of the murder.

351.    In December 2018, Ludwick testified he did not know if Matt Kamerick's phone number was compared to the tower data.

352.    In his December 2018 testimony, Ludwick stated he did not know if Callie Shinn's phone number was compared to the tower data. He testified he did not compare Michelle Daniel's number to the tower data.

353.    The cell tower data shows Jason Beaman received a call from the same number Sedlock's phone received a call from in the area of the Carter home at 9:34:53 am.

354.    The number that called Sedlock and Beaman from the area of the Carter home was registered to Sue Dabb.

355.    Sue Dabb's name arose in the criminal investigation in an interview of Tara Morris, who drove a taxicab in the Knoxville area during the time of the murder.

356.    Ms. Morris contacted law enforcement at an unknown time (unknown because law enforcement did not write a report of her interview) and told them while she was working as a cab driver shortly after the murder, she gave a ride to Sue Dabb and Jim Dabb, and both of them were discussing the murder and appeared to have inside knowledge of what happened.

357.    Jim Dabb was never interviewed.

358.    Despite this clear information that a reasonable law enforcement official would have investigated, Defendants never put it together that Sue Dabb's phone called Sedlock and Beaman around the time when Shirley Carter was likely to have been murdered and in the area of the murder.

## K.  MISLEADING/FALSE STATEMENTS AND WITHHOLDING OF EXCULPATORY EVIDENCE

359.    Defendants alleged during Jason Carter's criminal trial that the cell tower records from the tower in the area of the Carter home showed Jason Carter left the crime scene after discovering his mother's body, purportedly to hide the murder weapon.

360.    The basis for this argument was cell tower evidence showing Jason Carter's cell phone pinged (communicated with) a number of different cell phone towers in the area on the day of the crime, including the time shortly after he found his mother dead in her home.

361.    Defendants knowingly and falsely argued the only way his cell phone would have pinged other towers is if Jason Carter left the scene so as to be in the vicinity of another tower.

362.    Despite asserting the cell tower records showed Jason left the crime scene before law enforcement arrived, in March 2016 Ludwick had knowledge multiple cell towers service Bill and Shirley Carter's residence.

363.    On March 4, 2016, Ludwick sent an email requesting assistance with Cellebrite and cell tower examination, and in that email Ludwick stated, "at the crime scene while standing in the same spot, we hit five separate cell towers."

364.    This email, and the results of Ludwick's test on his phone, were not provided to Jason Carter during discovery, but only after the defense filed a Motion to Compel and received those emails during Jason's criminal trial.

365.    Ludwick specifically discussed how the Cellebrite location data was not helpful to the State's case because Ludwick's phone hit five different towers while at the Carter home in an audio-recorded meeting with Bill Carter.

366.    Defendants clearly knew there was no basis to allege Jason Carter left the crime scene merely because his cell phone pinged several different towers—Ludwick's phone did the exact same thing while standing in one spot in the Carter home.

**L.  LAW ENFORCEMENT BASED ITS CASE ON UNSUBSTANTIATED, UNINVESTIGATED THEORIES**

367.   Ludwick knowingly and falsely theorized Jason Carter killed Shirley Carter because Shirley became aware Jason Carter was having an extramarital affair.

368.   No one reported Shirley Carter was aware Jason Carter was having an extramarital affair. In fact, anyone who was asked specifically stated that they never had a discussion with Shirley Carter about Jason Carter's extramarital affair and had no reason to believe she knew about it.

369.   Bill Carter told Ludwick shortly after the murder that if had Shirley been aware of the extramarital affair, she would have supported and protected Jason Carter.

370.   Ludwick's stated his basis for believing Shirley Carter was aware of Jason Carter's extramarital affair was Shirley accompanied Shelly Carter, Jason's wife, to a doctor's appointment before the murder.

371.   Ludwick guessed Shirley became aware of the extramarital affair because Shelly might have been tested for sexually transmitted diseases at that appointment, and the results may have been positive.

372.   Although Defendants clung to this theory for years, they did absolutely nothing to investigate it.

373.   There would have been only one thing law enforcement needed to do to confirm its theory – obtain Shelly Carter's medical records from that doctor's visit.

374.   During his July 2018 deposition, Detective Kious stated Ludwick told him "Jason Carter had a sexually transmitted disease" and "if [Jason] had sexual intercourse

with his wife that he would pass on that sexually transmitted disease and that if she was going in for a checkup it was possible that that checkup revealed there was . . . a disease present and that it was also possible that Shirley Carter could be present while this was disclosed."

375.   Detective Kious stated the hypothesis that Shirley would have learned of that during the medical visit "cannot be disproven at this time."

376.   Whether Shirley became aware of a positive result for a sexually transmitted disease test could easily have been disproven if law enforcement made the very basic request for Shelly Carter's medical records.

377.   Upon hearing this theory, Jason Carter's defense counsel requested and received the records showing Shirley was present with Shelly for a medical visit to address Shelly's vertigo (a condition Shirley and Shelly shared – and not a sexually transmitted disease).

378.   Ludwick never requested these records, but continued to base his theory of guilt on this conjecture, instead of on actual evidence.

## M. THE LOCATION OF THE MURDER WEAPON

379.   In April 2016, Todd Farver contacted law enforcement stating the murder weapon may be located in Chris Brees' home.

380.   Unreasonably, Defendants did not interview Farver until November 2018.

381.   Law enforcement did not look in Chris Brees' home for the gun until December 2018.

382.    In the fall of 2015 (exact date is unknown because law enforcement wrote the reports months to years after the interview and did not remember when it was conducted) Tameka Jenkins told law enforcement Jason Beaman said "they're not going to find the gun." Joe Sedlock told law enforcement Beaman was his source of information on the gun.

383.    Defendants did not interview Beaman until May 2018.

384.    Matt Kamerick told Defendants he sold two guns to Roger Shinn (Callie Shinn's father), one of which was a bolt action rifle.

385.    Defendants went to Roger Shinn's home on October 19, 2015.

386.    The corresponding report from this visit shows Defendants collected two firearms from Shinn, one of which was a bolt action rifle with a scope on it.

387.    Despite the report stating Defendants collected both guns from Shinn, there is only a receipt for one gun.

388.    The audio of this interview reflects Defendants did not look at all of Shinn's guns.

389.    Shinn told Defendants the rounds in the bolt action rifle came with the rifle, and that he had not shot the rifle.

390.    The gun had capacity to hold six rounds—but only had four rounds in it.

391.    Significantly, Shirley Carter was shot twice.

## N.  BIAS AGAINST JASON CARTER

392.   Ludwick told Jason Carter's defense counsel in his July 2018 deposition that Jason Carter was on his radar as a suspect even before Ludwick arrived on scene on June 19, 2015.

393.   Ludwick's subsequent course of action shows Jason Carter was the only person Ludwick considered a suspect in an almost four-year investigation, despite numerous uninvestigated leads pointing to other individuals.

394.   Ludwick failed to investigated leads that pointed to other individuals, including people who claimed to have directly heard confessions to the murder

395.   Even more significantly, Ludwick removed Marion County Sheriff Jason Sandholdt from the criminal investigation because Jason Sandholdt did not believe Jason Carter was responsible for the murder.

396.   Asking a law enforcement officer (and in this case, the lead law enforcement officer in the jurisdiction in which the crime occurred) to step down from a case because he questioned the lead investigator's theory of the crime sent the message to every other law enforcement officer investigating the crime that they should support the lead investigator's unsubstantiated theories without question or be removed from the investigation.

397.   During Jason Carter's civil trial, Ludwick sent an email to Katharine Ashburn, another DPS employee, stating he "want[s] to put the first set of handcuffs on Jason [Carter]."

398.    On December 12, 2017, also during the civil trial, Ludwick sent another email stating he was "hoping for handcuffs before Christmas" (to which the Ms. Ashburn replied, "[e]veryone loves jewelry for Christmas") and informing her that Jason was "now on the witness stand!!!!!!!!"

399.    Ludwick was under court-ordered sequestration at the time he sent these emails.

400.    After Jason Carter's arrest, Ms. Ashburn sent Ludwick a picture Trooper Jon Thorup took of Ludwick arresting Jason. In response, Ludwick stated he "might get it framed."

401.    As previously shown in this Complaint, the evidence shows Ludwick intentionally manipulated witness interviews and put inaccurate information into his written reports.

402.    No mistakes were ever made in Jason Carter's favor. No inculpatory evidence was omitted.

## O. DEFENDANTS MANIPULATED CIVIL PLAINTIFFS AND USED THE CIVIL ACTION AS A PROXY TO PROSECUTE JASON CARTER AND LEVERAGE THE LIABILITY FINDING INTO CRIMINAL CHARGES

403.    Defendants, through Ludwick and other law enforcement officers, engaged in manipulative tactics with the Civil Plaintiffs.

404.    These actions occurred in the period following the murder, during the civil trial, and until Jason Carter's criminal trial.

405.    Defendants made purposeful misrepresentations and omissions to Bill Carter and the Civil Plaintiffs relating to Jason Carter's culpability in the murder.

## USE OF THE CIVIL TRIAL TO OBTAIN INFORMATION

## LUDWICK'S VIOLATION OF SEQUESTRATION ORDER

406.   Ludwick repeatedly violated the sequestration order during the civil trial.

407.   He admitted under oath that he was around the courthouse every day except for one day during the civil trial.

408.   When questioned as to his purpose in the courthouse if he was not watching the trial, Ludwick stated he was there as courthouse security and "knowledge of the case." When asked if he was assigned to courthouse security, he stated he "[didn't] recall being assigned to it, no."

409.   Ludwick testified he used his time at the courthouse during the civil trial to "try[ ] to gain as much information regarding this homicide investigation that [he] could."

410.   On the next day of his deposition (apparently having had a conversation with someone outside of the deposition) Ludwick backtracked, stating "yesterday you asked—or indicated, insinuated that I was at the courthouse every day for the civil trial. And I just don't recall being there."

411.   The transcript speaks for itself—no one "indicated" or "insinuated" Ludwick was there every day—he used those words himself.

412.   After waffling and backtracking on almost everything he said the prior day about his presence during the civil trial, Ludwick made this telling statement: "But this has been my biggest case from the first two years of this case, and I was not going to miss an opportunity to see or overhear any of our witnesses. I would camp out in Jason Carter's

bedroom if I had the opportunity because I wanted to hear everything being said, and that was a good opportunity to be there."

413.   Jon Thorup testified Ludwick was the person keeping him up to date on what was going on in the civil trial and let him know if it was going well or poorly.

414.   Ludwick admitted during the civil trial he would gain information from reporters and from the County Attorney's Office "when it was appropriate." He specifically recalled being told who was testifying and would "poke [his] head into the media room to see who was on the stand."

415.   Marion County Attorney Edward Bull sat through the entire civil trial and took notes. At the conclusion of the civil trial, and on the same day of the jury's verdict, he authorized charges to be filed against Jason Carter for murder.

## ABUSE OF THE DISCOVERY PROCESS

416.   Defendants focused on and involved themselves in the civil suit as a means to obtain evidence against Jason that Defendants would otherwise have been constitutionally prohibited from obtaining.

417.   Defendants collaborated with Plaintiffs in their civil subpoenas as described above and provided only false evidence that made Jason Carter look guilty without context, and withheld all exculpatory evidence that Jason could have used to defend himself in the civil trial.

418.   Defendants did not develop any evidence on its own inculpating Jason Carter beyond what was provided to the Civil Plaintiffs for use in the civil trial between the murder and the civil trial.

419.     Virtually no investigation was done whatsoever after the civil trial began until Jason Carter's defense team deposed law enforcement in July 2018 and pointed out the lack of investigation. It was only after Jason Carter's defense team deposed law enforcement in July 2018 and identified myriad leads they had not followed and evidence they had not pursued that law enforcement began to superficially follow up on some of the leads.

420.     Defendants used the civil discovery process to gain further information on Jason Carter and used the Civil Plaintiffs as an agent in so doing. Once the charges were authorized mere hours after the liability verdict, what little investigation that was done virtually stopped until after July 2018.

421.     Ludwick stated in an email on December 8, 2017 that the civil case, and the fact that Jason blamed Bill for the murder, "[would] make the criminal case against JASON easier in criminal court . . . Both sides in the civil side told the jury 'The Killer [sic] of Shirley Carter is sitting in this very courtroom.' [That's] a perfect gift for us!!!"

422.     Ludwick stated in deposition in July 2018 "once the civil depositions started, it was obvious we weren't going to have [the arrest warrant] signed before then."

423.     Defendants were clearly hoping to gain inculpatory evidence in civil depositions.

424.     Ludwick admitted it was "possible" but "unlikely" he helped provide questions for the Civil Plaintiffs to ask in Jason Carter's civil deposition.

425.    Conversely, when Detective Kious was asked if he ever directed the Civil Plaintiffs' counsel to ask Jason Carter particular questions in his deposition, he stated he "[didn't] remember anything specific, but [he] very well could have."

426.    Kious admitted that in order to prepare for his criminal deposition, he reviewed a civil transcript from Lynnette Castillo (Bill Carter's live-in friend), and she had "been providing [him] some information."

427.    Ludwick participated in at least one meeting at the Civil Plaintiffs' lead counsel's office before the civil trial, and before criminal charges were brought against Jason Carter, and several meetings with the Civil Plaintiffs' local counsel, also before criminal charges were brought against Jason Carter.

428.    Kious admitted to participating in at least four meetings with Civil Plaintiffs' local counsel before criminal charges were ever brought against Jason Carter.

429.    Ludwick discussed when Defendants planned to arrest Jason Carter for murder, stating he "specifically recall[ed] having a discussion with the sheriff and my boss about, once a verdict comes back, before it's read, before it's announced, that's a perfect time to arrest him."

430.    Ludwick wrote in an email on December 8, 2017 he was "hoping [they] got the green light to make an arrest as soon as either JASON CARTER testifies (which he will have to do in the civil courtroom) or as soon as the civil trial is concluded."

431.    Kious admitted when discussing when to charge Jason with murder, they "were holding off until the civil trial was finished."

432.    Kious conceded he thought waiting was foolish at the time, but they "gain[ed] some additional information, statements on the record by all parties involved . . . . [s]o it actually proved to be beneficial. . . ."

433.    Defendants agreed to provide the Civil Plaintiffs with certain criminal investigation files subject to a series of private conversations between the Civil Plaintiffs and the State.

434.    After discussing what evidence would or would not be provided, on June 13, 2017, Assistant Attorney General Laura Roan and Bull sent the Civil Plaintiffs' counsel an email stating they would only agree to provide certain things and not others "for no other reason than that we are still trying to hold together some semblance of a confidential criminal investigation with a public trial looming in civil court."

435.    This exchange makes clear Defendants limited the scope of the documents it would provide not because Defendants were actually concerned about the confidentiality of the criminal investigation, but only to maintain the *appearance* of confidentiality concerns.

436.    This was not the only joint action taken by Defendants and the Civil Plaintiffs. Within the same email chain, the Civil Plaintiffs' counsel discusses arranging a meeting between the Civil Plaintiffs' expert witnesses and DCI investigators and other law enforcement personnel.

437.    It is clear that regular coordination occurred between the Civil Plaintiffs and law enforcement, including in both April 2017 and June 2017, as well as sometime afterward. This coordination was admitted to by Kious.

438.   This coordination culminated in the private agreement between the Civil Plaintiffs and Defendants regarding the sharing of seemingly inculpatory evidence related to Jason, without any of the credible, relevant, material, and admissible exculpatory evidence that existed.

439.   Ludwick, Kious, Marion County officials, and counsel for DCI, coordinated with the Civil Plaintiffs in the civil case with the joint goal of obtaining evidence against Jason Carter through civil discovery that would not otherwise be obtainable by the State through criminal proceedings and without having filed criminal charges, and to tip the scales of justice in favor of the Civil Plaintiffs and against Jason.

440.   Defendant's choice to only share with the Civil Plaintiffs the evidence that tended to inculpate Jason, while being fully aware of the mountains of exculpatory evidence in its file that showed Jason could not have committed the murder, directly resulted in a $10 million judgment against Jason Carter.

441.   Defendants' actions, through the Civil Plaintiffs, benefited both Defendants and the Civil Plaintiffs and placed immense pressure on Jason Carter, depleting his property, placing his liberty at risk without due process, and further violating numerous other rights protected by the United States and Iowa Constitutions.

442.   The actions by Defendants, in concert with the Civil Plaintiffs, prevented a fair submission of the civil case, prevented Jason Carter from making a defense, violated established practices and rules in civil and criminal law, and consisted of improper actions and omissions on the part of both Defendants (as an unnamed party in the civil case) and the Civil Plaintiffs.

443.    Throughout the criminal investigation into the murder, Defendants purposefully and intentionally and falsely misrepresented, hid, chose not to explore, and otherwise failed to obtain evidence that showed they lacked probable cause to arrest Jason Carter.

444.    Defendants worked in tandem with the Civil Plaintiffs, meeting often, sharing evidence, planning deposition questions and strategizing trial tactics, each with the unified goal of obtaining a civil judgment against Jason and obtaining evidence to support a criminal conviction, and leveraging the civil judgment into criminal charges.

## COUNT I
## VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. § 1983

### False Arrest

#### (Against Defendants Mark Ludwick & Reed Kious)

445. Plaintiff incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

446. Carter has a clearly established right under the Fourth and Fourteenth Amendments to the United States Constitution and Iowa state law to be free from unreasonable seizure of his person, a right Defendants Ludwick and Kious violated when, claiming to act under proper legal authority, they failed to conduct a reasonable criminal investigation and, in fact, worked with and conspired with the civil plaintiffs to file a murder charge against Carter without any probable to believe that Carter murdered his mother.

447. Defendants Ludwick and Kious knew, or reasonably should have known, that no probable cause existed for Carter's arrest and that a reasonable police officer in their positions would have investigated suspects that claimed to have confessed to the murder or who had knowledge of the murder prior to concluding whether probable cause existed to arrest Jason Carter and Defendants Ludwick and Kious did not conduct a reasonable investigation.

448. The actions of Defendants Ludwick and Kious were willful, wanton, unlawful, and in gross disregard for the federally protected rights of Jason Carter, justifying an award of punitive damages.

**COUNT II**
**VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE**
**CONSTITUTION OF THE UNITED STATES, DUE PROCESS CIVIL RIGHTS**
**VIOLATION PURSUANT TO 42 U.S.C. § 1983**

Due Process Violation
(Against Defendants Ludwick, Kious and Carter)

449. Plaintiff incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

450. In the course of the civil case against Jason Carter, Defendants deliberately fabricated false statements and deliberately obstructed justice and acted in coordination with the private Civil Plaintiff Bill Carter in order to bring about the jointly desired result of a civil judgment against Jason Carter and therefore causing Jason Carter to falsely prosecuted for a heinous crime he did not commit.

451. Defendants' actions and omissions or inactions, (a) directly assisted and acted through the Civil Plaintiffs to obtain a civil judgment against Jason Carter, (b)

encouraged and created an atmosphere in which the private citizen Civil Plaintiffs deprived Jason Carter of his constitutional rights, and (c) allowed, assisted, and guided the private citizen Civil Plaintiffs to perform functions traditionally performed by the State, including the investigation of a criminal action and the collection and retention of inculpatory and exculpatory evidence related to that crime.

452. Defendants' actions in directly assisting and acting through the Civil Plaintiffs to obtain a civil judgment against Jason Carter, in encouraging and creating an atmosphere in which the private citizen Civil Plaintiffs deprived Jason Carter of his constitutional rights, and in allowing, assisting, and guiding the Civil Plaintiffs to perform functions traditionally performed by the state, were not associated with the judicial phase of the criminal process.

453. A close nexus existed between the Defendants' and the Civil Plaintiffs' conduct in the prior civil action as both were interdependent upon one another for information and evidence, and therefore were joint participants in the violation of Jason Carter's constitutional rights.

454. This interdependence between the Defendants and the Civil Plaintiffs created an variety of mutual benefits to both the State and the Civil Plaintiffs, which included but was not limited to the sharing of evidence to support the Civil Plaintiff's claims against Jason Carter and collection of evidence from Jason Carter through the civil law process which the State would not have otherwise been entitled to collect.

455. The Defendants and the Civil Plaintiffs enjoyed a symbiotic relationship in their goal of obtaining a civil judgment against Jason Carter. Through this relationship,

the State coerced action against Jason Carter by the Civil Plaintiffs, and also significantly encouraged actions by the Civil Plaintiffs against Jason Carter.

456. This symbiotic relationship between the Defendants and the Civil Plaintiffs turned the Civil Plaintiffs into state actors.

457. The actions taken by the Defendants and through State actor Civil Plaintiffs in the prior civil action violated Jason Carter's civil and constitutional rights, including: provision of only seemingly inculpatory evidence to the Civil Plaintiffs to assist in obtaining a civil judgment against Jason Carter, suppression and failure to disclose known exculpatory evidence to Jason Carter, failing to discover exculpatory evidence through avenues provided to or known to law enforcement but not explored, provision of discovery requests to the Civil Plaintiffs, the collection of sworn statements and other evidence from Jason Carter, and entry of a $10 million judgment against Jason Carter.

458. All of these actions by the Defendants, including deliberately false statements and allegations and the withholding of exculpatory evidence were the basis of the criminal complaint against Jason Carter.

459. Absent this misconduct, the arrest and prosecution of Jason Carter could not and would not have been pursued and justice would not have been obstructed in the pursuit of Shirley Carter's killer.

460. As a result of this violation of his constitutional right to due process, Jason Carter suffered and continues to suffer injuries.

461. The misconduct that occurred in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Jason Carter's constitutional rights.

**COUNT III**
**VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. § 1983**

<u>False Arrest</u>

(*Monell* Liability Claim Against Defendant Marion County)

462. Plaintiff incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

463. Defendant Marion County is a person for purposes of a Section 1983 action for damages.

464. Marion County failed to establish and/or maintain, and/or enforce official county policies, patterns, practices, or customs for determining when probable cause exists to charge individuals with law violations as well as train and supervise Defendant Kious on how to properly investigate a homicide since Defendant Kious freely admitted that he learned most of his investigative techniques from watching television. .

465. Prior to the events described above, Marion County deliberately and with reckless disregard for the constitutional rights of its citizens failed to establish an adequate and sufficient policy and procedure for training or supervising Defendant Kious and other law enforcement officers within the county sheriff's office regarding investigating crimes, collecting inculpatory and exculpatory evidence pertaining to crimes,

and arresting and/or otherwise detaining or infringing on the constitutional rights of individuals.

466. Prior to the events described above, Marion County deliberately and with reckless disregard for the constitutional rights of its citizens failed to adequately and sufficiently train and/or supervise Defendant Kious and other law enforcement officers within the county sheriff's office regarding investigating crimes, collecting inculpatory and exculpatory evidence pertaining to crimes, and arresting and/or otherwise detaining or infringing on the constitutional rights of individuals.

467. The customs and practices of Marion County were ones which involved the failure to initiate policies to ensure its citizens are charged only with violations of the law that are supported by probable cause, not multiplicitous, and/or have an adequate and independent basis in the law to support a conviction, and that its citizens' constitutional rights are not otherwise unconstitutionally infringed by law enforcement or the county attorney's office.

468. The acts and/or omissions of Marion County regarding prosecutor and citizen and law enforcement and citizen interactions amounted to deliberate indifference to the rights and safety of citizens, including Jason Carter.

469. The actions and/or omissions of Marion County intruded upon Jason Carter's right to be free from unreasonable searches and seizures, to be free from being charged with law violations that were multiplicitous, baseless, and/or unsupported by probable cause, and to be free from his due process rights relating to Marion County

employee's input, assistance, and participation in the Civil Plaintiff's wrongful death suit against Jason Carter.

470. The failure of Marion County to implement effective policies, patterns, practices, and/or customs was a moving force behind, and effectively caused, the Marion County Sheriff's Office to violate Jason Carter's constitutional rights.

## COUNT IV
## MALICIOUS PROSECUTION

(Against Defendants Ludwick & Kious)

471. Plaintiff incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

472. Jason Carter was prosecuted in a criminal proceeding in *State v. Carter*, Marion County case No. FECR029316, beginning on or about December 17, 2017.

473. Defendants Ludwick and Kious caused this prosecution by preparing and filing a criminal complaint against Jason Carter that they knew was not supported by probable cause.

474. The criminal prosecution ended favorably for Jason Carter, with an acquittal following a jury trial.

475. Ludwick and Kious acted without probable cause.

476. Based upon the facts known to Ludwick and Kious, no reasonable law enforcement officer or prosecutor could believe probable cause existed to charge Jason Carter with the offense charged.

477. Ludwick and Kious acted with malice towards Carter by knowingly, falsely and intentionally making false statements, giving false testimony and .and by conspiring with the civil plaintiffs, including Defendant Bill Carter, to obtain a civil judgment and an attempted criminal conviction against a man against whom they knew probable cause did not exist.

## COUNT V
## ABUSE OF PROCESS

(Against Defendants Ludwick, Kious, and Carter)

478. Plaintiff incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

479. Defendants used the prior civil action instituted against Jason Carter by the Civil Plaintiffs for the wrongful purpose of violating Jason Carter's constitutional rights to gain information to use in his prosecution, and to level a $10 million judgment against him in order to place undue pressure on him.

480. In the course of the civil case against Jason Carter, Defendants, abused the civil process against Jason Carter when acting in coordination with the private Civil Plaintiffs in order to bring about the jointly desired result of a civil judgment against Jason Carter, and to unconstitutionally gain sworn statements and other evidence from Jason Carter.

481. Bill Carter and the Civil Plaintiffs abused the civil process against Jason Carter when acting in coordination with Defendants to obtain sworn statements and other evidence from Jason Carter with the intent to share Defendants, and which the State was

constitutionally prohibited from obtaining on their own without instituting a criminal matter against Jason Carter.

482. Bill Carter and the Civil Plaintiffs further abused the civil process in maintaining their civil action against Jason Carter after obtaining exculpatory evidence from Defendants which rendered their good-faith belief in the assertions against Jason Carter as set forth in their pleadings and other case filings.

483. Bill Carter and the Civil Plaintiffs further abused the civil process in violating Iowa law and Iowa's civil discovery rules through their failure to disclose required documents and information to Jason Carter after obtaining exculpatory evidence and other evidence and information from Defendants and other individuals, which evidence and information was required to be disclosed to Jason Carter through the civil discovery process.

484. Defendants' actions and omissions or inactions, (a) directly assisted and acted through the Civil Plaintiffs to obtain a civil judgment against Jason Carter, (b) encouraged and created an atmosphere in which the private citizen Civil Plaintiffs deprived Jason Carter of his constitutional rights, and (c) allowed, assisted, and guided the private citizen Civil Plaintiffs to perform functions traditionally performed by the State, including the investigation of a criminal action and the collection and retention of inculpatory and exculpatory evidence related to that crime.

485. A close nexus exists between the Defendants' and the Civil Plaintiffs' conduct in the prior civil action as both were interdependent upon one another for

information and evidence, and therefore were joint participants in the violation of Jason Carter's constitutional rights.

486. This interdependence between the Defendants and the Civil Plaintiffs created a variety of mutual benefits to both Defendants and the Civil Plaintiffs, which included but was not limited to the sharing of evidence to support the Civil Plaintiff's claims against Jason Carter and collection of evidence from Jason Carter through the civil law process which Defendants would not have otherwise been entitled to collect.

487. The Defendants and the Civil Plaintiffs enjoyed a symbiotic relationship in their shared goal of obtaining a civil judgment against Jason Carter. Through this relationship, the State coerced action against Jason Carter by the Civil Plaintiffs, and also significantly encouraged actions by the Civil Plaintiffs against Jason Carter.

488. This symbiotic relationship between the Defendants and the Civil Plaintiffs turned the Civil Plaintiffs into State actors.

489. The actions taken by the Defendants and through State actor Civil Plaintiffs, and the actions of Bill Carter and the Civil Plaintiffs in the prior civil action violated Jason Carter's civil and constitutional rights, including: provision of only inculpatory evidence to the Civil Plaintiffs to assist in obtaining a civil judgment against Jason Carter, suppression and failure to disclose known exculpatory evidence to Jason Carter, failing to discover exculpatory evidence through avenues provided to or known to law enforcement but not explored, provision of discovery requests to the Civil Plaintiffs and the collection of sworn statements and other evidence from Jason Carter, entry of a $10 million judgment against Jason Carter. Defendants, through their officers and agents, acting within the scope of

their employment, further violated Jason Carter's Article I, Section 6 rights when they took him into custody without Jason Carter having committed a criminal offense.

490. Defendants, through their officers and agents, acting within the scope of their employment, abused the civil process against Jason Carter when they collaborated with the Civil Plaintiffs in the civil trial, used the Civil Plaintiffs as an agent to obtain information on Jason Carter during the civil discovery process and trial, and aided the Civil Plaintiffs generally in their civil prosecution of Jason Carter. Defendants further violated these same rights by leveraging the civil liability finding into criminal charges.

## COUNT VI

## NEGLIGENT AND WRONGFUL INVESTIGATION BY COUNTY EMPLOYEES PURSUANT TO IOWA CODE CHAPTER 670

(Against Defendants Marion County, Kious, & Ludwick)

491. Plaintiff incorporates by reference the allegations of the proceeding paragraphs as though set forth at length herein.

492. At all times material to this action, an employer-employee relationship existed between Marion County, Iowa, and Kious and Ludwick as employees.

493. Mark Ludwick was an employee of Marion County as defined in Iowa Code § 670.2(2) because Ludwick performed services for Marion County in investigating Shirley Carter's homicide. Indeed, Ludwick stated repeatedly that he was in charge of the homicide investigation and that he made the final decision as to which leads to follow and which evidence to pursue.

494. Mark Ludwick and Reed Kious, in their official capacities as law enforcement officers for Marion County, had a duty to reasonably investigate the murder

of Shirley Carter, including the duty to reasonably follow up on information and leads provided to law enforcement, to uncover and collect potentially inculpatory and exculpatory information relating to possible suspects, and to fulfill all other duties and obligations placed on law enforcement officers.

495. Mark Ludwick and Reed Kious breached these duties by failing to reasonably and appropriately following leads, collect inculpatory evidence relating to other suspects, collect exculpatory evidence relating to Jason Carter, and to otherwise act as a reasonable law enforcement officer in discharging their duties.

### PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Carter respectfully requests the following:

    a)  An award of compensatory damages against all Defendants, joint and severally, in an amount to be determined at trial;

    b)  An award of punitive damages against all Defendants;

    c)  An award for costs, expenses and counsel fees pursuant to 42 U.S.C. § 1988; and

    d)  Enter such other relief as this Honorable Court may deem just and deserving.

### JURY DEMAND

A trial by jury is hereby demanded.

Thursday, December  12, 2019

Respectfully submitted,

*s/Glen S. Downey*
Glen S. Downey
AT0012428

LAW OFFICES OF GLEN S. DOWNEY
5214 Ingersoll Avenue
Des Moines, IA  50312
Tel: (412) 865-7110
Fax: (515) 259-7599
glen@downey-law.net

*/s/ Christine E. Branstad*
Christine E. Branstad          AT0001125
BRANSTAD & OLSON LAW OFFICES
2501 Grand Ave. Suite A
Des Moines, IA 50312
Telephone: (515) 224-9595
Facsimile: (515) 281-1474
Email: Branstad@BranstadLaw.com

*/s/ Alison F. Kanne*
Alison F. Kanne          AT0013262
WANDRO & ASSOCIATES, P.C.
2501 Grand Ave. Suite B
Des Moines, IA 50312
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
Email: akanne@2501grand.com